IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LISA COOPER,

          Plaintiff,

v.                                CIVIL ACTION NO.   2:19-cv-00324

WESTFIELD INSURANCE COMPANY, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

    Before the Court are cross-motions for summary judgment filed by Plaintiff Lisa Cooper ("Plaintiff"), (ECF No. 18), and Defendant Westfield Insurance Company ("Westfield"), (ECF No. 20).   For the reasons more fully stated herein, Plaintiff's motion, (ECF No. 18), is **DENIED** and Westfield's motion, (ECF No. 20), is **GRANTED**.

                                      I.     BACKGROUND

    Plaintiff is the owner of Mom's Place Too, a restaurant located in Calhoun County, West Virginia.   (ECF No. 20-1 at 2.)   She brings this declaratory action to determine Westfield's obligations under an insurance policy to provide Plaintiff with coverage in connection with an employment lawsuit filed by Plaintiff's former employee, Georgie Gaglione ("Gaglione").   (*Id.*)

    Gaglione filed the underlying employment lawsuit, bearing Civil Action Number 16-C-1441, against Plaintiff, Mom's Place Too, and other defendants in the Circuit Court of Kanawha County, West Virginia, on September 21, 2016 (the "Gaglione Suit").   (ECF No. 20-2.)   The Gaglione Suit asserted claims for defamation, false light invasion of privacy, wrongful discharge

in violation of public policy, and tortious interference based upon events that occurred in October 2015 at Plaintiff's restaurant.[1] (ECF No. 20-3.) Specifically, Gaglione alleged that these defendants originated and/or published "false accusations about [Gaglione's] medical status" that resulted in the termination of her employment from Mom's Place Too. (*Id.* at ¶ 3.) Gaglione claimed to have suffered damage to her reputation, invasion of her privacy, mental and emotional distress, loss of income, and lost wages and benefits. (*Id.* at 5–6.) As a result, she sought damages for her mental and emotional distress, the value of her lost wages and benefits, punitive damages, injunctive relief, including, reinstatement of her employment, and attorneys' fees and costs. (*Id.*)

At the time of these alleged events and the Gaglione Suit, Westfield insured Plaintiff d/b/a Mom's Place Too with commercial general liability ("CGL") coverage. The CGL coverage, Policy Number CWP7466146, was effective from February 9, 2015 to February 9, 2016 (the "2015 Policy") and February 9, 2016 to February 9, 2017 (the "2016 Policy) (collectively, "Westfield Policies"). (ECF Nos. 20-6, 20-7.) Pursuant to the Westfield Policies, Plaintiff requested a defense and indemnification with respect to the Gaglione Suit. Westfield, however, determined that under the Westfield Policies it did not have a duty to defend or indemnify Plaintiff against the claims asserted against her and issued Plaintiff a denial letter on July 6, 2018. (ECF No. 20-5.)

Consequently, on October 31, 2018, Plaintiff filed this action against Westfield, her insurer, Bill Bailey Insurance Agency, Inc. d/b/a The Reed Sturm Agency ("Reed Sturm"), her insurance agent, and Thomas Seymour, a Westfield claims adjuster,[2] in the Circuit Court of Wirt County,

---

[1] The specific claims brought against Plaintiff and Mom's Place Too include defamation, false light, and wrongful discharge in violation of public policy. The tortious interference claim was brought solely against other defendants, who are not relevant to this action.
[2] Plaintiff failed to serve Mr. Seymour within the required time allotted for service under the Federal Rules and the

2

West Virginia, seeking a declaration that Westfield is obligated under the Westfield Policies to indemnify Plaintiff for any judgments rendered against her in the Gaglione Suit and underwrite any expenses incurred by her in the defense of the Gaglione Suit (Count I). (ECF No. 20-1.) Additionally, Plaintiff seeks damages for unfair trade practices (Count II), bad faith (Count III), negligence (Counts IV and V), and breach of contract arising from Westfield's denial of coverage (Count VI).

Plaintiff later settled her claims against Reed Sturm, and the state court dismissed it as a party to this action on March 27, 2019. (ECF No. 1-8.) Once Reed Sturm was dismissed, Westfield removed this action to this Court on April 26, 2019, based on diversity jurisdiction. (ECF No. 1.) Thereafter, this Court entered a scheduling order, which bifurcated and stayed, for purposes of discovery and trial, Plaintiff's tort claims (Counts II–V). (ECF No. 8.) Thus, the matter now before the Court is limited to coverage issues (Counts I and VI).

Plaintiff and Westfield filed the present motions for summary judgment on December 19, 2020, and December 20, 2020, respectively. (ECF Nos. 18, 20.) The parties both filed a response on January 6, 2020, (ECF Nos. 24, 25), and Westfield filed a reply on January 13, 2020, (ECF No. 26). To date, Plaintiff has not filed a reply. As the deadline for filing a reply has elapsed, the motions are now ripe for adjudication.[3]

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment is appropriate when the moving party

---

West Virginia Rules of Civil Procedure and, thus, this Court dismissed Mr. Seymour from this action in its Memorandum Opinion and Order, dated February 28, 2020. (ECF No. 30.)

[3] Also pending is Westfield's motion to exceed the page limit, (ECT No. 22), as to its memorandum in support of its motion for summary judgment. For good cause shown, the motion, (ECF No. 22), is **GRANTED**.

"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and quotation marks omitted).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

On the intersection of the standards for summary judgment and contract interpretation, the Fourth Circuit has observed that the matter of "interpretation is a subject particularly suited for summary judgment . . . ." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999); *see also Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 6 (W. Va. 1998) (stating "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination . . . .") (citation omitted). However, it has also been observed

4

that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact . . . [and] summary judgment is inappropriate." *Sempione v. Provident Bank*, 75 F.3d 951, 959 (4th Cir. 1996).

## III. DISCUSSION

Plaintiff represents that all the proceeds from her settlement with Reed Sturm were paid to Gaglione in exchange for the execution of a release of all claims asserted against her in the Gaglione Suit. (ECF No. 19 at 2.) As a result of that exchange, Plaintiff contends that the question regarding Westfield's duty to indemnify Plaintiff in connection with the Gaglione Suit is now moot. However, in its counterclaim, Westfield asks this Court to declare that the Westfield Policies do not provide coverage to Plaintiff for any of the claims asserted against Plaintiff in the Gaglione Suit and that Westfield owes no duties of defense and indemnity. (ECF No. 31.) Accordingly, the Court will address both Westfield's duties to defend and indemnify below.

In cases grounded in diversity jurisdiction, a federal court is "obliged to apply the substantive law of the state in which it sits." *Volvo Constr. Equip. N. Am. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)). Under West Virginia law, language in an insurance policy should be given its "plain, ordinary meaning." Syl. Pt. 8, *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 511 (W. Va. 2013) (citations omitted).; *Nationwide Mut. Ins. Co. v. Hatfield*, 2005 WL 2978046, *2 (S.D. W. Va. Nov. 7, 2005) ("In examining language of an insurance policy, words and phrases are to be given their 'plain, ordinary meaning unless they are specifically defined in the policy.'") (citation omitted). If, after giving the language its customary meaning, the provisions in an insurance policy "are plain and unambiguous and where such provisions are not contrary to a

5

statute, regulation, or public policy, the provisions will be applied and not construed." Syl. Pt. 1, *Kelly v. Painter*, 504 S.E.2d 171, 172 (W. Va. 1998). Whether a contract is ambiguous is a question of law. Syl. Pt. 4, *Blake v. State Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 897 (W. Va. 2009) (noting "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous"). Courts must give full effect to the plain meaning of clear and unambiguous insurance policy contract provisions. *Id.* at Syl. Pt. 2. If, on the other hand, a provision is ambiguous, courts are to construe it "against the drafter, especially when dealing with exceptions and words of limitation." *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 58 (W. Va. 2010) (quotations and citations omitted); *First Mercury Ins. Co., Inc. v. Russell*, 806 S.E.2d 429, 435–36 (W. Va. 2017) (stating, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated.").

An ambiguous policy provision is one "reasonably susceptible of two different meanings or of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." Syl. Pt. 3, *Glen Falls Ins. Co. v. Smith*, 617 S.E.2d 760 (W. Va. 2005). This liberal construction, however, "should not be unreasonably applied to contravene the object and plain intent of the parties." *Id.* at Syl. Pt. 4 (citation omitted). A court is "obligated to give an insurance contract that construction which comports with the reasonable expectations of the insured." *Burr v. Nationwide Mut. Ins. Co.*, 359 S.E.2d 626, 631 (W. Va. 1987); *Glen Falls Ins. Co.*, 617 S.E.2d at 768 ("The standard is that of what a reasonable person standing in the shoes of the insured would expect the language to mean.").

Regardless, "[a]n insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 236, 778 S.E.2d 677, 685 (W. Va. 2015) (citing Syl.

6

Pt. 7, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987)). Thus, in cases involving a determination of the scope of insurance coverage, the insured "bears the burden of establishing a prima facie case that the claim falls within the scope of coverage. Once a prima facie case has been established, the burden shifts to the insurer to demonstrate that an exclusion applies." *Runion v. Minnesota Life Ins. Co.*, 2013 WL 2458541, *2 (S.D. W. Va. June 6, 2013) (internal citation omitted).

Additionally, the West Virginia Supreme Court of Appeals described the standard for determining whether an insurance company has a duty to defend an insured as follows:

> An insurance company's duty to defend an insured is broader than the duty to indemnify under a liability insurance policy. An insurance company has a duty to defend an action against its insured if the claim stated in the underlying complaint could, without amendment, impose liability for risks the policy covers. If, however, the causes of action alleged in the plaintiff's complaint are entirely foreign to the risks covered by the insurance policy, then the insurance company is relieved of its duties under the policy.

*Bowyer v. Hi–Lad, Inc.*, 609 S.E.2d 895, 912 (W. Va. 2004). As a general rule, courts are to consider whether the allegations in the underlying complaint against the insured are "reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." Syl. pt. 4, *Tackett v. Am. Motorists Ins. Co.*, 584 S.E.2d 158, 158–60 (W. Va. 2003) (internal quotation marks and citations omitted). *See also* Syl. pt., *Farmers & Mechs. Mut. Fire Ins. Co. of W. Va. v. Hutzler*, 447 S.E.2d 22 (W. Va. 1994) ("When a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts" to determine "whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide."). An insurer must defend all claims against the insured if any claims fall within the policy coverage. *Tackett*, 584 S.E.2d

7

at 529; *Horace Mann Ins. Co. v. Leeber*, 376 S.E.2d 581, 584 (W. Va. 1988) (citing *Donnelly v. Transp. Ins. Co.*, 589 F.2d 761, 765 (4th Cir. 1978)). Further, "[a]ny question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." *Id.* at syl. pt. 5.

The Westfield Policies at issue here provide CGL coverage under two separate insuring agreements, pertinent to this litigation: Coverage A (Bodily Injury and Property Damage Liability) and Coverage B (Personal and Advertising Injury Liability). (ECF No. 20-6, 20-7.) Each insuring agreement has a general aggregate limit of $2,000,000, a personal and advertising injury limit of $1,000,000, and a $1,000,000 limit for each occurrence. (ECF No. 20-6 at 94.) Mom's Place Too is a named insured under the polices as well as Plaintiff, "but only with respect to the conduct of [Mom's Place Too]." (*Id.* at 12, 107.)[4]

A. Coverage A

Coverage A in the CGL Coverage Form applies to "bodily injury" or "property damage" caused by an "occurrence." (*Id.* at 99.) The CGL Coverage Form defines these terms as follows:

> "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
> * * *
> "Property damage" means:
>   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
> * * *
> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

---

[4] The specific coverage declarations, forms, terms, exclusions, and endorsements at issue in this action are the same across the Westfield Policies. Therefore, the Court will cite to only the 2015 Policy throughout the remainder of this Memorandum Opinion and Order unless stated otherwise. Further, where policy language is quoted throughout this Memorandum Opinion and Order, all emphasis has been omitted unless stated otherwise.

8

(*Id.* at 111, 113–114.) While not defined in the policies, the term "accident" in the context of insurance policies has been defined as "a chance event or event arising from unknown causes." *W. Virginia Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 492 (W. Va. 2004).

Plaintiff argues that the alleged publication of defamatory statements constitutes an "occurrence" and triggers a duty to defend under the Westfield Policies. Plaintiff, however, offers nothing but her own subjective interpretation to support this argument. Contrary to Plaintiff's assertion, the causes of action alleged against Plaintiff in the Gaglione Suit—defamation, false light, and wrongful discharge—must arise from intentional acts and, thus, these alleged acts cannot form the basis of an accident or "occurrence." *See State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 778 S.E.2d 677, 684 (W. Va. 2015) (recognizing that claims including defamation and breach of contract are "either intentional or contractual in nature" and, therefore, are not occurrences "under the terms of the CGL policy."); *Westfield v. Pinnacle Grp., LLC*, 137 F. Supp. 3d 912, 918–19 (S.D. W. Va. 2015) (concluding invasion of privacy does not constitute an "occurrence" because the conduct that formed the basis of the claim was intentional); *Erie Ins. Prop. & Casualty Co., Inc. v. Edmond*, 785 F. Supp. 2d 561, 566 (N.D. W. Va. 2011) (holding that wrongful discharge, invasion of privacy, and breach of contract do not result from an "occurrence"). Similarly, tortious interference, though not asserted against Plaintiff or Mom's Place Too, does not arise from an accident but rather intentional conduct. *See Wilson Works, Inc. v. Great Am. Ins. Group*, 495 F. App'x 378, 380 (4th Cir. 2012) (holding that a claim for tortious interference with business relations is an intentional tort, not an "occurrence" or accident under CGL policy). Therefore, because the claims asserted in the Gaglione Suit are intentional in nature, they are not "reasonably susceptible of an interpretation" of coverage. Syl. Pt. 4, *Tackett*,

9

584 S.E.2d at 159. As a result, Westfield has no duty to defend Plaintiff from these claims.

Even if the Gaglione Suit did allege an "occurrence" under the Westfield Policies, there are no averments that "bodily injury" or "property damage" resulted from Plaintiff's alleged defamation to invoke coverage under Coverage A. Instead, the Gaglione Suit alleges that Gaglione sustained "mental and emotional distress as well as loss of income." (ECF No. 20-3 at 6.) It is well-established under West Virginia law that mental and emotional injuries do not constitute "bodily injury, sickness or disease" as required under the bodily injury portion of the Westfield Policies. *See Tackett*, 584 S.E.2d at 166 (allegations of mental and emotional injuries do not constitute "bodily injury"); Syl. Pt. 1, in part, *Smith v. Animal Urgent Care, Inc.*, 542 S.E.2d 827, 831 (W. Va. 2000) ("purely mental or emotional harm that . . . lacks physical manifestation does not fall within a definition of 'bodily injury' which is limited to 'bodily injury, sickness, or disease.'"). Nor do economic losses, such as loss of income and benefits, satisfy the definition of "property damage" because such damage requires "physical injury to" or "loss of use of tangible property." (ECF No. 20-6 at 114.) *See, e.g., Westfield Ins. Co. v. White*, 19 F. Supp. 2d 615, 617 (S.D. W. Va. 1998) (holding that purely economic losses are not tangible property and, therefore, are not covered as "property damage"). Plaintiff does not dispute the absence of bodily injury or property damage allegations. Accordingly, Gaglione's Complaint is entirely foreign to the risks covered by Coverage A of the Westfield Policies because it does not allege "bodily injury" or "property damage."

*B. Coverage B*

Coverage B in the CGL Coverage Form "applies to 'personal and advertising injury' caused by an offense arising out of [Mom's Place Too's] business . . . ." (ECF No. 20-6 at 104.)

The CGL Coverage Form defines "personal and advertising injury", in pertinent part, as follows:

> "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
> \* \* \*
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy[.]

(*Id.* at 113.) Westfield concedes that the allegations in the Gaglione Suit state a "personal and advertising injury" within the meaning of Coverage B. Nevertheless, Westfield argues that Coverage B is subject to two exclusionary endorsements in the Westfield Policies that preclude coverage: the Employment-Related Practices Exclusion (the "ERP Exclusion") and the Exclusion - Access or Disclosure of Confidential or Personal Information and Date-Related Liability - With Limited Bodily Injury Exception (the "Personal Information Exclusion").

1. <u>The Employment-Related Practices Exclusion</u>

The ERP Exclusion provides, in pertinent part, that insurance under Coverage B does not apply to the following:

> "Personal and advertising injury" to:
> (1) A person arising out of any:
> \* \* \*
> (b) Termination of that person's employment; or
> (c) Employment-related practices, policies, acts or omissions, such as . . . defamation [or] humiliation . . . directed at that person[.]

(*Id.* at 121.) According to Plaintiff, the ERP Exclusion does not exclude coverage of Gaglione's claims when applying a narrow construction because they do not arise from an employment-related act. Alternatively, Plaintiff contends that the exclusion is ambiguous and should be construed against Westfield as the insurer. Westfield disagrees, arguing that under a broad interpretation of

11

the exclusion's plain language the asserted claims are employment related because they arise from Plaintiff's intentional acts, which affected the employment relationship.

The parties acknowledge the divide among federal courts as to whether the language of ERP exclusions should be narrowly or broadly defined. The division focuses on the breadth of the phrase "arising out of any . . . employment-related practices, policies, acts or omissions." *Compare Peterborough Oil Co. v. Great Am. Ins. Co.*, 397 F. Supp.2d 230, 238–39 (D. Mass. 2005) (adopting a narrow definition of "employment-related" to include only "matters that directly concern the employment relationship itself, such as the demotion, promotion or discipline of employees by employers, and tortious acts that may accompany such personnel decisions, such as discrimination, harassment, or defamation.") *with Capitol Indem. Corp. v. 1405 Assoc., Inc.*, 340 F.3d 547, 550 (8th Cir. 2003) (holding that the term "arising out of" must be broadly construed thereby requiring a broad construction of the ERP exclusion to bar coverage for any claim arising out of the employment relationship).

In *Cornett Management Co., LLC v. Fireman's Fund Ins. Co.*, 332 F. App'x 146 (4th Cir. 2009) (unpublished), the Fourth Circuit addressed a similar ERP exclusion. In determining how to interpret this exclusion under West Virginia law, the court looked to the West Virginia Supreme Court of Appeal's decision in *Bowyer v. Hi–Lad, Inc.*, 609 S.E.2d 895, 913 (W. Va. 2004). There, "the West Virginia court indicated that the ERP exclusion would apply to any claim arising from an employer's act or omission intended to result in" the alleged injury. *Cornett*, 332 F. App'x at 148 (emphasis removed); *Bowyer*, 609 S.E.2d at 913 ([T]here is nothing to indicate that the [insured's] actions were intended to cause humiliation."). In keeping with the West Virginia Supreme Court of Appeals, the Fourth Circuit held that only acts that "intentionally" cause the

12

alleged injury and "clearly have an effect on the employment relationship" qualify as "employment-related" acts. *Cornett*, 332 F. App'x at 149. The *Cornett* court held that "limiting the ERP exclusion to claims in which the employer *intends* to cause [the alleged injury] . . . prevents the exclusion from applying to all acts done by an employer or impacting an employee, a broad interpretation that has led some courts to find the provision ambiguous." *Id.* at n.3 (emphasis in original).

Though not binding precedent on this district, the *Cornett* decision is persuasive and suggests that courts should defer to the exclusion's plain and expansive language. *See Erie Ins. Prop. & Cas. Co. v. Edmond*, 785 F. Supp. 2d 561, 573 (N.D. W. Va. 2011) (following the *Cornett* decision and adopting a broad reading of the ERP exclusion). In the Gaglione Suit, each claim is predicated on the allegation that Plaintiff published information about Gaglione's health for the purpose of making a decision about Gaglione's continued employment as a cook at Mom's Place Too. As a result, the Gaglione Suit alleges that Gaglione "could not come to work . . . because she was humiliated and upset that her coworkers believed that she had Hepatitis C"; that Plaintiff requested Gaglione to return her keys to Mom's Place Too; and that after Gaglione provided a negative result for Hepatitis C, "[Plaintiff] had no positions for [Gaglione] to return to work." (ECF No. 20-3 ¶¶ 13, 16, 18.) Considering these allegations, there can be no dispute that Plaintiff's purported acts affected Gaglione's employment relationship. Plaintiff attempts to evade application of the ERP Exclusion, contending that her alleged defamatory statements about Gaglione were not made in relation to Gaglione's employment status but rather in order for "[Plaintiff to] fulfill[] her duty to provide a reasonably safe place for her customers to dine." (ECF No. 19 at 8.) However, this characterization does not change the central allegation—that Plaintiff

13

engaged in defamatory acts with the objective of making a personnel decision as to Gaglione.

Plaintiff next focuses on the intent requirement and argues that the exclusion does not apply because the facts alleged in the Gaglione Suit do not imply that Plaintiff acted with intent to harm or injure Gaglione. In considering the intent requirement, the Court turns to the Northern District of West Virginia's decision in *Edmond*, 785 F. Supp. 2d 561. There, an insurance provider filed a declaratory judgment action to determine if there were a duty to defend the insured defendants in the underlying state court action. *Id.* at 563. The underlying action alleged certain torts, including, among others, wrongful discharge in violation of public policy, false imprisonment, invasion of privacy, and creating a hostile work environment through sexual harassment. *Id.* The insurance policy included an ERP exclusion identical to the one at issue here. In addressing the intent requirement of the ERP exclusion, the *Edmond* court explained that this requirement can be satisfied where intent is implied by law or where the claim, by its very nature, is intentional under West Virginia law. *Id.* at 573. Ultimately, the court found that, as a matter of law, the insured "impliedly knew that his acts violated the rights of the underlying plaintiff, and therefore committed them intentionally" and, "[e]ven if such intent and knowledge were not implied," false imprisonment and invasion of privacy are intentional in nature under West Virginia law. *Id. Edmond* makes clear, contrary to Plaintiff's assertion, that a showing that the acts giving rise to or forming the basis of a cause of action were intentional is sufficient to satisfy the requirement.[5]

Here, the intent requirement is satisfied under either theory established in *Edmond*. First, the allegations in the Gaglione Suit demonstrate that the underlying acts by Plaintiff, which formed the

---

[5] Though Plaintiff initially refutes this interpretation of the intent requirement in her brief, she appears to later concede this point, stating that, under *Edmond*, "[i]t makes no difference whether the intent was implied in law, by statute or the facts, it is the finding of an intentional act which qualified the actions as fitting within the ERP exclusion." (ECF. No. 25 at 4.)

14

basis of the defamation and false light claims, were intentional. According to the Amended Complaint, Plaintiff published the information she learned about Gaglione's health status to numerous people and on multiple occasions for the purpose of making a decision regarding Gaglione's continued employment at Mom's Place Too. (ECF No. 20-3 at ¶¶ 9–12, 15.) The alleged making of defamatory statements, which lie at the heart of Gaglione's claims, cannot be considered accidental. Second, as noted previously, defamation, false light, and wrongful discharge in violation of public policy are intentional torts under West Virginia law and, thus, are intentional in nature for purposes of the ERP Exclusion. *See supra* at 8. Accordingly, the underlying claims fall within the ambit of the ERP Exclusion and are barred from coverage.[6]

### 2. The Personal Information Exclusion

The Personal Information Exclusion provides, in pertinent part, that insurance under Coverage B does not apply to the following:

> Access Or Disclosure Of Confidential Or Personal Information
> "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including . . . health information or any other type of nonpublic information.
> This exclusion applies even if damages are claimed for . . . any other loss, cost or expense incurred by you or others arising out of any . . . disclosure of any person's or organization's confidential or personal information.

(*Id.* at 123.) Westfield argues that the allegations in the Gaglione Suit fall precisely within the scope of this exclusion. Indeed, the entirety of Gaglione's claims and the facts alleged in support thereof arise from the purported disclosure of allegedly false information regarding Gaglione's health (i.e. that she had Hepatitis C). (ECF No. 20-3 at ¶¶ 9–12 (alleging that Plaintiff told numerous individuals that Gaglione had Hepatitis C).)

---

[6] The Court finds, and Plaintiff does not dispute, that Plaintiff's wrongful discharge claim in violation of public policy also falls under Section 1b. of the ERP Exclusion, which precludes coverage for any "personal and advertising injury to [a] person arising out of any . . . [t]ermination of that person's employment[.]"

15

Plaintiff does little to dispute the application of the Personal Information Exclusion. In fact, she concedes that this exclusion precludes "coverage for injury resulting from the disclosure of personal information." (ECF No. 25 at 4.) However, it appears to be Plaintiff's view that the Gaglione Suit is exempt from this exclusion because "[Plaintiff] was forced to react to a health and safety situation . . . ." (*Id.* at 5.) But no such exception or "privilege," as Plaintiff characterizes her conduct, exists in the policies. Assuming Plaintiff was responding to a health and safety concern, there is no dispute that, in doing so, Plaintiff disclosed her former employee's "health information". (ECF No. 20-6 at 123.) Therefore, the claims asserted in the Gaglione Suit fall squarely within the plain language of the Personal Information Exclusion and, consequently, are barred from coverage.[7]

C. *Reasonable Expectations of the Insured*

Next, Plaintiff argues that, even if the ERP Exclusion applies, she should be covered by the Westfield Policies because she had a reasonable expectation of coverage. In support of her argument, Plaintiff relies on *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987), where the West Virginia Supreme Court of Appeals explained that, under the doctrine of reasonable expectations, "the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Id.* at 495 (alterations and quotation omitted). Drawing on the language in *McMahon* stating that "[a]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make

---

[7] To the extent Plaintiff contends that, like the ERP Exclusion, there is an intent requirement with respect to the application of the Personal Information Exclusion, Plaintiff cites no legal authority for that proposition nor is the Court aware of such a requirement. Therefore, the Court will not read such a requirement into the exclusion here.

16

exclusionary clauses conspicuous, plain, and clear," *id.* at 496, Plaintiff concludes that the Westfield Policies are ambiguous. However, she fails to coherently articulate how so. Specifically, she claims that "the [ERP Exclusion] applies specifically to non-employees"; that "[Plaintiff] held the reasonable expectation that the policy insured the actions of those acting on behalf of the corporation, including employees"; and that "[i]f the exclusion was read to exclude all employees, which would include [Plaintiff], coverage would be non-existent for those it was intended to protect." (ECF No. 19 at 13–14.) Though irrelevant to the coverage issues here, Plaintiff appears to focus on her status as an employee of Mom's Place Too.

As Westfield explains, "the application of the ERP Exclusion is not contingent upon the acting party's status as an employee of the insured entity." (ECF No. 24 at 9 (emphasis removed).) Indeed, only Gaglione's status as an employee is relevant to the application of the ERP Exclusion. *See supra* at 12 ("only acts, which 'intentionally' cause the alleged injury and 'clearly have an effect on the employment relationship' qualify as 'employment-related' acts"). Additionally, the ERP Exclusion plainly states that it "applies . . . [w]hether the insured may be liable as an employer or in any other capacity[.]" (ECF No. 20-6 at 121.) Therefore, even if Plaintiff could establish that she was acting in some capacity other than as Gaglione's employer when she made the allegedly defamatory statements, her actions would still fall within the plain language of the ERP Exclusion. Accordingly, Plaintiff's assertion that Westfield's denial of her claim frustrates her reasonable expectation of coverage is untenable.

D. *Knowing Violation Exclusion*

As a final matter, Plaintiff argues that the Knowing Violation of Rights of Another Exclusion (the "Knowing Violation Exclusion") does not apply here because Westfield did not

make intentional acts coverage sufficiently available to Plaintiff and Mom's Place Too. In support of this argument, Plaintiff directs the Court to *W. Virginia Employers' Mut. Ins. Co. v. Summit Point Raceway Assoc., Inc.*, 719 S.E.2d 830 (W. Va. 2011). In *Summit Point*, the West Virginia Supreme Court of Appeals held that insurers are required under the West Virginia Code to make intentional acts coverage "available to insured upon their voluntary request." *Id.* at 840. The West Virginia court, ultimately, found that because the insurer sent two letters to its customers indicating how to apply for such coverage, it fulfilled its duty to make the intentional acts coverage available to its insureds. *Id.* at 840–41.

      Plaintiff points to this illustration in an attempt to show that, unlike the insurer in *Summit Point*, Westfield did not fulfill its duty to make intentional acts coverage available to Plaintiff. However, she offers no evidentiary support for her argument and, thus, has failed to carry her burden of showing the absence of any genuine issue of fact. Further, although the Knowing Violation Exclusion was alleged to preclude coverage in the Westfield's amended answer and counterclaim, (ECF No. 31 ¶ 37), Westfield appears to have abandoned this claim as it did not rely on this exclusion in its denial of coverage, (ECF No. 20-5), or in its summary judgment motion. Accordingly, the Knowing Violation Exclusion is not at issue here.

      In conclusion, although "an insurer's duty to defend is broader than its duty to indemnity" under a liability insurance policy, *Camden-Clark Mem'l Hosp. Assoc. v. St. Paul Fire and Marine Ins. Co.*, 682 S.E.2d 566, 575 (W. Va. 2009), there is no obligation to provide either where the insurance policy offers no coverage. Since the Westfield Policies here afford no coverage to Plaintiff and Mom's Place Too for any of the claims asserted in the Gaglione Suit, Westfield owes no duties of defense and indemnity in connection with the Gaglione Suit. Accordingly,

Westfield's motion is **GRANTED** with respect to Counts I and VI.

As there is no coverage under the Westfield Policies, it follows that Plaintiff's common law bad faith claim (Count III) is now moot. It is well-established in West Virginia that a claimant may only maintain a common law bad faith claim if there is insurance coverage. *See Jordache Enterprises, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 513 S.E.2d 692, 711–12 (W. Va. 1998); *Cava v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 753 S.E.2d 1, 9 n.6 (W. Va. 2013). Accordingly, Westfield's motion for summary judgment as to Count III is also **GRANTED**.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for summary judgment, (ECF No. 18), and **GRANTS** Westfield's motion for summary judgment, (ECF No. 20), with respect to Counts I, III, and VI. The Court declares that the Westfield Policies afford no coverage to Plaintiff and Mom's Place Too for any of the claims asserted and damages sought to be recovered in the Gaglione Suit, and, as a result, Westfield owes no duties of defense and indemnity in connection with the Gaglione Suit.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 22, 2020

THOMAS E. JOHNSTON, CHIEF JUDGE